## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JUAN ESCALANTE-MELGAR, *et al.*,<br><br>Defendants. | Criminal Action No.: 16-453 (CCC)<br><br><br>OPINION |

**CECCHI, District Judge.**

Defendants Juan Escalante-Melgar ("Escalante-Melgar"), Elmer Cruz-Diaz ("Cruz-Diaz"), and Oscar Sanchez-Aguilar ("Sanchez-Aguilar") (collectively, the "Defendants") were jointly charged in a superseding indictment (the "Superseding Indictment") on April 25, 2018.[1] ECF No. 46. The Superseding Indictment has seven counts: (1) Racketeering Conspiracy; (2) Conspiracy to Commit Murder in Aid of Racketeering; (3) Murder in Aid of Racketeering; (4) Conspiracy to Commit Murder in Aid of Racketeering; (5) Discharging a Firearm During a Crime of Violence; (6) Causing Death Through Use of a Firearm; and (7) Conspiracy to Commit Murder in Aid of Racketeering. Id. Escalante-Melgar is charged with counts 1, 2, 3, 4, 5, 6, and 7. Id. Cruz-Diaz is charged with counts 1, 3, 4, 5, 6, and 7. Id. Sanchez-Aguilar is charged with counts 1, 3, 4, 5, and 6. Id. Defendants are alleged to be members of an international gang known as La Mara Salvatrucha or MS-13 ("MS-13"). Id. at 1.

---

[1] Defendants Juan Garcia-Gomez ("Garcia-Gomez"), Jose Rivera-Robles ("Rivera-Robles"), and Christian Linares-Rodriguez ("Linares-Rodriguez") were also charged in the Superseding Indictment. ECF No. 46. Garcia-Gomez entered a plea of guilty on January 27, 2020. ECF No. 134. Rivera-Robles entered a plea of guilty on February 27, 2020. ECF No. 137. Linares-Rodriguez is currently in El Salvador.

Presently before the Court are the Government's and Defendants' pretrial and *in limine* motions. ECF Nos. 81, 83, 88, 101–02, 106–07, 117.[2] At oral argument on February 11, 2020, the parties agreed that certain motions were resolved and that certain motions would be decided on the papers. *See* ECF No. 120 at 7:3–14:24. The Court then heard argument on the remaining motions. ECF No. 120. On February 19, 2020, the Court held an evidentiary hearing on Sanchez-Aguilar's motion to suppress statements made to police. ECF No. 131 at 4:16–19. The Court has considered all the submissions[3] and oral arguments[4] made in support of and in opposition to the instant motions. The Court will discuss each motion in turn.

## I. U.S. WIRETAP

Escalante-Melgar moves to suppress evidence derived from a wiretap obtained in the United States on the telephone number 551-587-3519 (the "Humilde Wiretap"). ECF No. 82 at 14–16; ECF No. 91 at 49. Escalante-Melgar argues that the Humilde Wiretap was erroneously granted by United States District Judge Madeline Cox Arleo (the "District Judge") because "[t]here was not sufficient evidence linking the subject Defendants and the subject telephone numbers to any type of criminal activity to establish probable cause." ECF No. 82 at 16; *see* ECF No. 91 at 49–50. Accordingly, Escalante-Melgar asks this Court to exclude all evidence derived from the Humilde Wiretap from being presented at trial. The Government maintains that the Humilde Wiretap was properly granted by the District Judge as "the wiretap affidavit contained ample probable cause and provided extensive, case-specific detail regarding multiple traditional investigative techniques that law enforcement had either attempted and/or deemed futile." ECF No. 91 at 50.

---

[2] The Court granted Defendants' requests to join in their co-defendants' motions where applicable. ECF No. 120 at 14:19–21.

[3] ECF Nos. 81–86, 88–89, 91, 96–114, 117–18, 122–26, 129–30.

[4] ECF Nos. 120, 131.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, codified at 18 U.S.C. § 2510 *et seq.*, governs the use of wiretaps and other electronic eavesdropping. The statute authorizes the use of a wiretap if a judge determines that: (a) there is probable cause to believe that an individual is committing, has committed, or is about to commit an offense covered by the statute; (b) there is probable cause to believe that communications concerning the offense will be obtained through the interception; and (c) normal investigative procedures have been utilized to investigate the offense and have failed or appear unlikely to succeed if tried. 18 U.S.C. § 2518(3). With respect to probable cause, "[t]he issuing judge's probable cause determination is entitled to 'great deference' and will be upheld so long as the judge had a 'substantial basis' for concluding probable cause existed as to the Title III requirements." *United States v. Wilson*, No. 16-93 2018 WL 1293114, at *2 (D. Del. Mar. 13, 2018) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). With respect to necessity, if a statement of necessity is present in the application, then the reviewing court examines the issuing court's determination of necessity for abuse of discretion. *Wilson*, 2018 WL 1293114, at *3.

The Court finds that the District Judge had a substantial basis for finding that probable cause existed that crimes were being committed and that communications regarding those crimes would be discovered through the Humilde Wiretap. The Humilde Wiretap application was supported by the affidavit of Special Agent Brunner of the Federal Bureau of Investigation ("FBI Agent Brunner"), which described information from a confidential informant, interceptions of a consensually-monitored cell phone, interceptions obtained through Salvadoran wiretaps, and phone records. ECF No. 91 at 54–55 (citing to Exhibit A to ECF No. 91). These multiple sources provided support for the Government's belief that Escalante-Melgar was utilizing the phone number targeted by the Humilde Wiretap application to discuss gang meetings, the plot to kill

3

"Victim-1," distribution of marijuana, and other MS-13 activities. Id. at 56–58. Accordingly, the District Judge did not err in finding that the Humilde Wiretap application satisfied the probable cause requirements of 18 U.S.C. § 2518(3). *See United States v. Cannon*, 685 F. App'x 114, 117–18 (3d Cir. 2017) (quoting *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010)) (affirming the district court's finding of probable cause for wiretap where "the issuing judge had a 'substantial basis' for the probable cause determination").

The Court also finds that the necessity requirement was met in the Humilde Wiretap application. This Court finds that FBI Agent Brunner unequivocally included a statement of necessity in his affidavit in support of the Humilde Wiretap application. *See* Exhibit A to ECF No. 91 at 42–76. Further, this Court finds that the District Judge did not abuse her discretion in determining that the statement of necessity was sufficient. FBI Agent Brunner dedicated over thirty pages of his affidavit to the necessity of the Humilde Wiretap and explained why traditional sources of investigation, including but not limited to confidential sources, undercover informants, physical surveillance, tracking devices, and search warrants, had not succeeded in investigating MS-13 and were likely to fail if employed in the future. ECF No. 91 at 60–61 (citing Exhibit A to ECF No. 91). FBI Agent Brunner discussed how using undercover agents was impractical with MS-13 since agents could not attempt to enter MS-13 without endangering their safety. Id. at 62. He also explained how information from the Salvadoran wiretaps was obtained on a delay as it took time for the prosecutors in El Salvador to pass along relevant intercepts. Id. at 61–62. This extensive showing that the Humilde Wiretap was required to investigate the ongoing suspected criminal activity of MS-13 clearly satisfies the necessity requirement. *See Cannon*, 685 F. App'x. at 117 (affirming the district court's necessity requirement finding where wiretap application noted

inability to use undercover agents and need to collect evidence of broad conspiracy involving multiple individuals).[5]

Accordingly, the Court finds that the District Judge properly granted the Humilde Wiretap application and Escalante-Melgar's motion to suppress the Humilde Wiretap is **DENIED**.

## II.     SALVADORAN WIRETAP

Escalante-Melgar also moves to suppress evidence obtained from Salvadoran wiretaps. He argues that the Salvadoran wiretaps at issue in this case are the product of a joint venture between the government of the United States and the government of El Salvador. ECF No. 82 at 23–24; ECF No. 100 at 4–5. Escalante-Melgar further argues that because a joint venture existed between the two countries, "all applicable United States laws apply" to the wiretaps and "whether a foreign wire-tap violates the rights of the defendant or not requires an analysis under the Due Process clause of the 4th Amendment under the reasonable expectation of privacy standard." ECF No. 82 at 23–24. At oral argument, Escalante-Melgar also requested an evidentiary hearing to inquire into the alleged joint venture between the governments of the United States and El Salvador. ECF No. 120 at 33:7–18.[6]

The Government opposed Escalante-Melgar's application, arguing that it is clear from the papers and exhibits submitted that no joint venture existed between the two countries. ECF No. 91

---

[5] The Government also argues that even if the Humilde Wiretap application was deficient, the good faith exception to the exclusionary rule would independently support denial of the motion to suppress as "the affidavit was at least sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause and/or necessity." ECF No. 91 at 65. Escalante-Melgar has not presented any argument to refute the Government's contention that the good faith exception applies.

[6] The Fourth Amendment can also apply to searches in foreign countries where the conduct of law enforcement "shock[s] the conscience." *United States v. Callaway*, 446 F.2d 753, 755 (3d Cir. 1971). Escalante-Melgar does not argue that Salvadoran officials engaged in such conduct here and the Court agrees with the Government that such argument would be baseless under the facts of this case. *See* ECF No. 91 at 42.

at 38–47. Additionally, the Government argues that even if the Court finds a joint venture existed, evidence obtained from the Salvadoran wiretaps need only meet the Fourth Amendment's reasonableness test. Id. at 47. The Government further contends that even if the Court finds that a joint venture existed and the wiretaps failed to meet the Fourth Amendment's reasonableness requirement, the good faith exception to the exclusionary rule would require the Court to admit evidence obtained from the wiretaps as the evidence was obtained in reliance on a foreign court order. Id. at 48–49.

To determine whether a joint venture existed courts examine: "(1) [w]hether American authorities initiated the investigation in the foreign country[;] (2) [w]hether American authorities were involved in the decision to seek the foreign wiretap[;] (3) whether American officials controlled, directed, or supervised the foreign wiretap[; and] (4) [w]hether American officials participated in the implementation of the wiretap and the recording of conversations." *United States v. Minaya*, No. 17-359, 2019 WL 1615549, at *10 (D.N.J. Apr. 16, 2019). Escalante-Melgar argues that a joint venture existed here because "[i]t is clear from the recently produced documents [that] the U.S. was actively working with the El Salvadorian officials in collecting and evaluating the information on wiretaps." ECF No. 100 at 5. While it is true that the Salvadoran wiretap application contained some information from an FBI agent stationed in El Salvador, the application also included telephone toll analysis, surveillance of MS-13 members in El Salvador, and affidavits from prosecutors in El Salvador setting forth "background information on Linares-Rodriguez, his location, his membership in MS-13, and that he and others were involved in certain criminal offenses, including homicide." ECF No. 91 at 41. The wiretaps were sought only after an independent investigation by the Salvadoran government and the results of that investigation were presented to a Salvadoran judge who granted the wiretaps. Id. at 42, 49. The United States did not

implement or record the wiretaps, and were in fact denied access to the wiretap room and only given access to select recordings from the wiretaps on a delayed basis. Id. at 44–45. As such, the Court finds that a joint venture did not exist with respect to the Salvadoran wiretaps in this case. *See Minaya*, 2019 WL 1615549, at \*13 (holding that the sharing of information between United States Drug Enforcement agents and Dominican Republic law enforcement officers did not create a joint venture and holding that defendant "ha[d] not really produced any positive evidence of the existence of such a joint venture").

While it is clear that a joint venture has not been adequately alleged by Escalante-Melgar, even if a joint venture is assumed in this case, evidence obtained from the Salvadoran wiretaps would still be admissible. Where a joint venture is found, the law requires only that the search in question satisfies the Fourth Amendment's reasonableness requirement. *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 157, 167 (2d Cir. 2008). To determine whether the search was reasonable, courts look to see if the search comports with applicable foreign law. *See United States v. Peterson*, 812 F.2d 486, 490 (9th Cir. 1987) ("[T]he law of the foreign country must be consulted at the outset as part of the determination whether or not the search was reasonable."). Here, there is no assertion that the prosecutors in El Salvador did not comply with their country's law in obtaining the wiretaps at issue. In fact, the wiretaps were approved by a judge in El Salvador who reviewed the wiretap application submitted by Salvadoran prosecutors and found that the wiretap application met the legal requirements under the laws of El Salvador. *See* ECF No. 91 at 48; *see also* Translation of Application for Salvadoran Wiretap (exhibit to ECF No. 91). As the Fourth Amendment's reasonableness test is met here, evidence obtained from the Salvadoran wiretaps would be admissible even if a joint venture did exist. *See United States v. Barona*, 56

F.3d 1087, 1096 (9th Cir. 1995) (finding a joint venture but ruling wiretap was not subject to exclusion under the Fourth Amendment because foreign law was followed).

Finally, even if a showing had been made that a joint venture existed and that the laws of El Salvador were not followed such that the wiretaps did not meet the Fourth Amendment's reasonableness test, evidence obtained from the wiretaps would still be admissible under the good faith exception to the Fourth Amendment. *Peterson*, 812 F.2d at 492 (holding that "the good faith exception to the exclusionary rule . . . applie[d] to the foreign search"). As the Salvadoran wiretaps were approved by a judge in El Salvador, the Government agents investigating Escalante-Melgar were entitled to presume that the wiretaps were proper. *See id.* ("We conclude that the [good faith exception] reasoning applies . . . to reliance on foreign law enforcement officers' representations that there has been compliance with their own law."); *see also United States v. Lee*, 723 F.3d 134, 141 (2d Cir. 2013) (internal citations omitted) ("The facts of this case do not suggest that there was a 'joint investigation' with foreign law enforcement authorities within the meaning of our case law, and, even if there had been such an investigation, the District Court properly found that the government had made good-faith efforts to obtain the documents.").

Escalante-Melgar's request for an evidentiary hearing also fails. Evidentiary hearings in criminal cases "are not granted as a matter of course." *United States v. Hines*, 628 F.3d 101, 105 (3d Cir. 2010) (citing Fed. R. Crim. P. 12(c)). To show that an evidentiary hearing is required, a defendant must show that "(1) [he] has presented a colorable constitutional claim, and (2) there are disputed issues of material fact that will affect the outcome of the motion to suppress." *Id.* Here, the Court finds no evidentiary hearing is required with respect to the Salvadoran wiretaps as it is clear that no joint venture existed with respect to the wiretaps and no further exploration of

factual disputes will alter that analysis as Escalante-Melgar has not identified any specific unconstitutional conduct requiring investigation.

Accordingly, Escalante-Melgar's motion to suppress evidence obtained from the Salvadoran wiretaps is **DENIED** and the Court finds that no evidentiary hearing is required with respect to the motion.

## III. SUPPRESS STATEMENTS AND EVIDENCE

Sanchez-Aguilar moves to suppress various statements made to law enforcement officers. ECF No. 81-1 at 3. Sanchez-Aguilar also moves to suppress photographs from a police interview and evidence obtained from his cell phone by law enforcement. Id. at 7. An evidentiary hearing concerning these motions was held on February 19, 2020. ECF No. 127.

Sanchez-Aguilar argues that his statements made to Detective Caicedo of the West New York Police on July 1, 2015 and September 9, 2015 must be suppressed because he was illegally arrested on both occasions and was not provided with proper *Miranda* warnings in Spanish. ECF No. 81-1 at 7. Sanchez-Aguilar also argues that photographs taken of him during his interview on July 1, 2015 and content seized from his cell phone on that day must be suppressed because he was arrested illegally and did not give knowing and voluntary consent for the police to take his photograph or search his phone. Id.

The Government opposes Sanchez-Aguilar's motion to suppress by arguing that he was not arrested on July 1, 2015, and instead spoke with Detective Caicedo voluntarily. ECF No. 91 at 85. The Government also states that Sanchez-Aguilar was properly advised of his *Miranda* rights before he answered Detective Caicedo's questions on July 1, 2015 and knowingly and voluntarily consented to having his photograph taken and his phone searched on that date. Id. at 88–91. The Government further states that Sanchez-Aguilar was arrested pursuant to a domestic violence

9

arrest warrant on September 9, 2015, that he has not identified any issues with regard to his arrest on that date beyond conclusory assertions of an illegal arrest, and that he was properly read his *Miranda* rights prior to answering any questions on that date. Id. at 89–90.

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, the U.S. Supreme Court concluded that "without proper safeguards the process of in-custody interrogation . . . contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 436, 467 (1966). The Government must take certain steps to protect an individual's Fifth Amendment privilege against self-incrimination, including notifying a suspect in police custody prior to interrogation that he has a right to remain silent, that any statements he makes may be used against him in court, and that he has the right to have an attorney present at the interrogation. *Thompson v. Keohane*, 516 U.S. 99, 107 (1995); *see also Miranda*, 384 U.S. at 479. A defendant may waive these rights and make a statement, "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444. In opposition to a defendant's motion to suppress statements as involuntary, the Government must demonstrate by a preponderance of the evidence that: (1) the defendant was properly advised of his *Miranda* rights; (2) the defendant voluntarily, knowingly, and intelligently waived his rights; and (3) the ensuing statement was voluntary. *Colorado v. Connelly*, 479 U.S. 157, 168–69 (1986).

To determine the sufficiency of *Miranda* warnings and any waiver of rights, courts examine the totality of the circumstances surrounding the questioning. *See Arizona v. Fulminante*, 499 U.S. 279, 285–86 (1991); *United States v. Velasquez*, 885 F.2d 1076, 1086 (3d Cir. 1989). In analyzing the totality of the circumstances, a court "must look at the facts of a particular case,

including the background, experience, and conduct of the suspect." *Velasquez*, 885 F.2d at 1086. Potential circumstances affecting the voluntariness of a statement include: (1) evidence of police coercion; (2) the length and location of the interrogation; (3) the defendant's maturity, physical condition, mental health, and level of education; (4) whether *Miranda* warnings were given; and (5) whether an attorney was present for the interview. *See United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994). Statements following *Miranda* warnings and waivers are rarely deemed involuntary. *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver.").

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To prevail on a motion to suppress, a defendant generally bears the burden of proving that the challenged search or seizure was unreasonable under the Fourth Amendment. *See United States v. Acosta*, 965 F.2d 1248, 1256 n.9 (3d Cir. 1992). However, once a defendant has established a basis for his motion, the burden shifts to the Government to show that the search or seizure was reasonable. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). The Government must demonstrate by a preponderance of the evidence that the challenged evidence is admissible. *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974). "It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

The Court begins with Sanchez-Aguilar's motion to suppress his statements from the July 1, 2015 interview, the day that "Victim-3" was allegedly murdered. The West New York Police

approached Sanchez-Aguilar after recognizing his distinctive clothing from surveillance camera footage and asked him if he would be willing to discuss an incident they were investigating. ECF No. 91 at 87. Sanchez-Aguilar agreed to speak with the officers and participated in an interview with Detective Caicedo in Spanish. Id. The interview was videotaped, and on the video Sanchez-Aguilar is clearly given *Miranda* warnings in Spanish before any substantive questioning begins and is asked to acknowledge waiver of his *Miranda* rights on a form written in both Spanish and English. Id. at 87–88; Exhibit G to ECF No. 91. It is clear from the video that Sanchez-Aguilar knowingly and voluntarily waived his *Miranda* rights during the interview.

The Court further notes that even though Sanchez-Aguilar was properly given his *Miranda* rights before being questioned, the circumstances surrounding the interview do not support a finding that Sanchez-Aguilar was under arrest or that a reasonable person would have believed that he was not at liberty to terminate the interview and leave, such that the reading of *Miranda* rights was required. *United States v. Leese*, 176 F.3d 740 (3d Cir. 1999) (affirming finding that defendant was not in custody or coerced such that *Miranda* warnings were required where defendant was told she was not under arrest, was allowed to leave at the end of the interview, and was allowed to pause the interview for breaks). Sanchez-Aguilar went to the interview voluntarily and was not subjected to any coercive pressures as shown by the circumstances of the interview, including that Sanchez-Aguilar was not handcuffed or restrained at any time, was allowed to use the bathroom, was given food and beverage, and was allowed to leave the station at the conclusion of the interview. ECF No. 91 at 87–88; *see also* ECF No. 131 at 76–81. Sanchez-Aguilar was even explicitly told he was not under arrest during the interview (ECF No. 91 at 88), and the video of the interview shows Sanchez-Aguilar resting, conversing with Detective Caicedo and other officers in the room, and acting at ease. *See generally* Exhibit F to ECF No. 91. Accordingly, there

are no circumstances indicating that Sanchez-Aguilar's statements were coerced or involuntary. *See United States v. Jacobs*, 431 F.3d 99, 112 (3d Cir. 2005) ("The voluntariness inquiry examines the totality of the circumstances surrounding statements, and most of the circumstances of the [] statements indicate voluntariness.").

At the evidentiary hearing on February 19, 2020, counsel for Sanchez-Aguilar attempted to show that Sanchez-Aguilar was arrested or could have reasonably felt he was unable to resist questioning by the police on July 1, 2015, but Officer Vializ's testimony did not provide any support for that proposition. ECF No. 131 at 76–81, 87–92. In fact, Officer Vializ's testimony made it clear that Sanchez-Aguilar was not arrested and went to the interview voluntarily after speaking with officers on the street, inviting them into his apartment to obtain his personal identification, and riding in a civilian car to the interview. Id. at 76–77.

Additionally, with respect to the search of Sanchez-Aguilar's cell phone, Detective Caicedo explained, in Spanish, on videotape, that he needed to review Sanchez-Aguilar's cell phone to confirm Sanchez-Aguilar's claim that he had been out walking on the night in question due to a fight with his girlfriend. ECF No. 91 at 92; Exhibit E to ECF No. 91 at 108. Detective Caicedo further indicated that he needed Sanchez-Aguilar's consent to search the phone and then received unambiguous consent from Sanchez-Aguilar to do so. ECF No. 91 at 92–93. Although Sanchez-Aguilar points out that the consent to search form he signed on July 1, 2015 was printed in English, that fact alone does not alter the Court's finding that Sanchez-Aguilar clearly and affirmatively consented to the search of his cell phone in Spanish on video. The Court thus finds that the search of Sanchez-Aguilar's cell phone was proper. *Schneckloth*, 412 U.S. at 219. As Sanchez-Aguilar was not under arrest on July 1, 2015 by the West New York Police, and knowingly and voluntarily agreed to a videotaped interview and a search of his cell phone, the

Court denies Sanchez-Aguilar's motion to suppress his statements made during the July 1, 2015 interview with Detective Caicedo, photographs from the interview, and the contents of his cell phone, which was searched on that day.

Sanchez-Aguilar's request to suppress his statements made to police during an interview on September 9, 2015 is also denied. Sanchez-Aguilar was arrested pursuant a domestic violence arrest warrant and has not pointed to any deficiencies with respect to the warrant. ECF No. 91 at 86. Sanchez-Aguilar was read his *Miranda* rights in Spanish and signed a Spanish and English *Miranda* waiver form on that date. Id.; Exhibit G to ECF No. 91. Sanchez-Aguilar's contentions that he was subject to an illegal arrest and did not provide a knowing and voluntary waiver of his *Miranda* rights are meritless given the evidence before the Court.

Accordingly, for the reasons stated above, Sanchez-Aguilar's motion to suppress statements and evidence obtained by law enforcement officials on July 1, 2015 and September 9, 2015 is **DENIED**.

## IV.    BILL OF PARTICULARS

Defendants' motions for a bill of particulars request additional information with respect to: (1) count one, paragraph 39(f) of the Superseding Indictment, which alleges that Escalante-Melgar and Cruz-Diaz ordered members of the gang to collect money and ordered beatings for those who did not comply; (2) count one, paragraph 39(g), which alleges that Escalante-Melgar and Cruz-Diaz participated in conversations regarding the plan to surveil and kill "Victim-1"; (3) count one, paragraph 39(k), which alleges that all Defendants engaged in the distribution of cocaine; and (4) counts one, three, four, five, and six, which allege all Defendants' involvement in crimes arising out of the murder of "Victim-3." Defendants argue that the Superseding Indictment is so vague that they will be hampered in preparing a defense, may be surprised at trial with the introduction

14

of evidence, and may be subject to double jeopardy due to the Government's failure to adequately describe the crimes charged. The Government argues that a bill of particulars is unwarranted here, where the indictment is sufficiently detailed and there has been extensive discovery provided to the Defendants.

"The purpose of a bill of particulars is 'to inform the defendant of the nature of the charges brought against him, to adequately prepare his defense, to avoid surprise during trial and to protect him against a second prosecution for an inadequately described offense.'" *United States v. Urban*, 404 F.3d 754, 771 (3d Cir. 2005) (citation omitted). A bill of particulars should be issued "[o]nly where an indictment fails to perform these functions, and thereby 'significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial.'" *Id.* at 771–72 (citation omitted). An indictment is sufficient if "it contains the elements of the offense intended to be charged," *United States v. Addonizio*, 451 F.2d 49, 58 (3d Cir. 1971), and it need not "include every fact to be alleged by the government," *United States v. Moyer*, 674 F.3d 192, 203 (3d Cir. 2012). An indictment that "substantially follows the language of the criminal statute" is sufficient. *United States v. Eufrasio*, 935 F.2d 553, 575 (3d Cir. 1991). Further, "access to discovery . . . weakens the case for a bill of particulars." *Urban*, 404 F.3d at 772.

Here, the Superseding Indictment sufficiently places Defendants on notice of the charges against them and provides protection against double jeopardy. Defendants have not identified any count in the Superseding Indictment where the offense charged does not have all elements adequately alleged. Further, the Government has provided substantial discovery in this case. The Government has disclosed numerous FBI reports; local law enforcement reports; draft transcripts of recordings of hundreds of recorded calls from multiple wiretaps and thousands of actual recordings; applications, affidavits, and orders for wiretaps; crime scene and autopsy photographs;

surveillance video footage; and documents and videos containing Defendants' statements. ECF No. 91 at 113. The information provided in discovery goes beyond what is necessary to inform the Defendants of the relevant facts and circumstances surrounding the charges against them. Therefore, the Defendants' motions for a bill of particulars are **DENIED**.

## V.     RACKETEERING ENTERPRISE

Escalante-Melgar and Sanchez-Aguilar move to dismiss count one, which charges a racketeering conspiracy in violation of 18 U.S.C. § 1962(c) involving murder, extortion, witness tampering/retaliation, and distribution of controlled substances. ECF No. 46 ¶ 30. Defendants argue that the Superseding Indictment fails to properly allege a racketeering conspiracy because the Superseding Indictment alleges intra-gang beatings and attempted killings of gang members for disobedience, meaning that MS-13 lacked unity of purpose. *See* ECF No. 82 at 22–23. Without unity of purpose, Defendants contend that there can be no "association in fact enterprise." Id. The Government contends that the Superseding Indictment amply alleges an association in fact enterprise with a common purpose and further asserts that internal dissension and participation in varied criminal activities are not inconsistent with a racketeering conspiracy. ECF No. 91 at 125–29.

Federal Rule of Criminal Procedure 12(b)(3)(B) permits a defendant to move to dismiss an indictment for failure "to state an offense." When determining the sufficiency of an indictment, however, a district court must "accept[] as true the factual allegations set forth in the indictment." *United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir. 1990) (citation omitted). The essential elements of a racketeering conspiracy violation are: "(1) that two or more persons agreed to conduct or to participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity; (2) that the defendant was a party to or member of that agreement;

and (3) that the defendant joined the agreement or conspiracy knowing of its objective to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity." *United States v. John-Baptiste*, 747 F.3d 186, 207 (3d Cir. 2014) (citation omitted). To prove an association in fact enterprise, the Government must prove three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). "The existence of an enterprise at all times remains a separate element which must be proved by the Government." *United States v. Turkette*, 452 U.S. 576, 583 (1981).

The facts contained in the Superseding Indictment, accepted as true at this stage of the case, adequately allege a racketeering conspiracy. The Superseding Indictment alleges in count one that Escalante-Melgar, Cruz-Diaz, Sanchez-Aguilar, and others, agreed and conspired to participate in the affairs of the MS-13 enterprise through a pattern of racketeering. ECF No. 46 ¶ 30. It further alleges that each Defendant was a member of the MS-13 conspiracy, and joined the conspiracy knowing that MS-13 conducted its affairs through a pattern of racketeering consisting of violence, intimidation, and drug trafficking. Id.; id. ¶ 30(a)–(c).

To the extent Defendants argue that the Superseding Indictment shows the absence of unity within M3-13 (ECF No. 82 at 23), such contention does not alter the Court's determination that a racketeering conspiracy involving an association in fact enterprise has been adequately alleged. Defendants contend that unity of purpose is lacking due to MS-13 members who participated in different crimes and the violence employed by MS-13 members against one another. Id. Defendants' arguments with respect to the racketeering conspiracy are unpersuasive given that the distinct criminal activities were all alleged to have been done in furtherance of the MS-13 racketeering enterprise. ECF No. 46 ¶¶ 32–38. Similarly, the internal beatings and attempted

17

murders referenced in the Superseding Indictment were allegedly done in order to strengthen the racketeering enterprise and help achieve its common purpose as they showed MS-13 members what consequences would occur if they failed to abide by the organization's rules or follow their leaders' commands. *See* id. ¶ 35 ("It was further part of the manner and means of the conspiracy that defendants and other leaders, members, and associates of the MS-13 enterprise used violence and threats of violence to impose discipline within the gang, including against disloyal and/or disobedient gang members.").

A number of other courts have also found that violence within a racketeering enterprise and the presence of multiple separate criminal activities within a criminal conspiracy do not destroy the racketeering enterprise. *See United States v. Coonan*, 938 F.2d 1553, 1560–61 (2d Cir. 1991) (rejecting a challenge to sufficiency of racketeering enterprise where "the evidence clearly established that, regardless of internal disputes and membership changes, the [enterprise's] power structure endured and its members functioned as a unit"); *see also United States v. Amato*, 15 F.3d 230, 234 (2d Cir. 1994) ("Rivalry and dissension, however violent, do not necessarily signify dissolution of a conspiracy. An internal dispute among members of a conspiracy can itself be compelling evidence that the conspiracy is ongoing and that the rivals are members of it."). Moreover, numerous courts have held that MS-13 is an association in fact enterprise with a common purpose. *See, e.g.*, *United States v. Oliva*, 790 F. App'x 343, 347 (3d Cir. 2019) (affirming the lower court's finding that MS-13 defendants were members of a RICO enterprise); *United States v. Palacios*, 677 F.3d 234, 249 (4th Cir. 2012) ("The government here easily presented sufficient evidence to allow a reasonable jury to determine that MS-13 was an enterprise.").

Given the Court's finding that the allegations of a racketeering conspiracy in count one of the Superseding Indictment are proper and that Defendants' arguments of disunity of purpose are unavailing, Escalante-Melgar's and Sanchez Aguilar's motions to dismiss count one are **DENIED**

## VI.   SEVERANCE

Defendants move to sever their trials under Rule 14 of the Federal Rules of Criminal Procedure. Rule 14 permits the court to "order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires" to avoid prejudice. Fed. R. Crim. P. 14. The decision to sever or not sever a trial is within the District Court's "sound discretion." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). Defendants argue that severance is necessary to: (1) guard against spillover prejudice and (2) lessen the length and complexity of trial.[7] The Government argues that there is no danger of spillover prejudice here given the racketeering conspiracy charged in this case and points to numerous lengthy, multi-defendant trials to rebut Defendants' length and complexity argument. ECF No. 91 at 14–15.

The law is abundantly clear that joint trials are preferred where defendants are indicted together, as is the case here. *See Urban*, 404 F.3d at 775 (citation omitted) ("We begin with the fundamental principle that the federal system prefers 'joint trials of defendants who are indicted together.'"); *see also United States v. Sandini*, 888 F.2d 300, 306 (3d Cir. 1989) ("[I]n cases of defendants jointly indicted ordinarily there should be a single trial."). This is especially so where a conspiracy is charged. *See United States v. Stephenson*, 924 F.2d 753, 761 (8th Cir. 1991) ("Rarely, if ever, will it be improper for coconspirators to be tried together."); *see also United States v. Fernandez*, 388 F.3d 1199, 1242 (9th Cir. 2004) ("[A] joint trial is particularly appropriate

---

[7] Defendants initially argued that severance was required due to statements of co-defendants, but that argument is now moot given the Government's agreement to redact those statements. ECF No. 120 at 11:25–12:1.

where the co-defendants are charged with conspiracy, because the concern for judicial efficiency is less likely to be outweighed by possible prejudice to the defendants when much of the same evidence would be admissible against each of them in separate trials."); *United States v. Walker*, 720 F.2d 1527, 1533 (11th Cir. 1983) ("The general rule is that defendants who are jointly indicted should be tried together, and this rule applies with particular force to conspiracy cases."). Severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.

The burden to show severance is required is substantial and Defendants are unable to meet it here. *United States v. Quintero*, 38 F.3d 1317, 1343 (3d Cir. 1994) ("[D]efendants have a heavy burden in gaining severance."). Defendants' arguments with respect to spillover prejudice are unavailing because the Superseding Indictment has adequately alleged the existence of a racketeering conspiracy. As acts committed in furtherance of the conspiracy are admissible against each member of the conspiracy, there is no risk of spillover prejudice when co-defendants are charged in the same conspiracy. *See United States v. Hart*, 273 F.3d 363, 370 (3d Cir. 2001) (finding no spillover prejudice "because [defendants] were charged under the same conspiracy, [and] acts committed by one in furtherance of the conspiracy were admissible against the other"); *United States v. DeLuca*, 137 F.3d 24, 36 (1st Cir. 1998) (citation omitted) ("[S]ince any evidentiary spillover is vitiated where the evidence in all events would have been admissible against the movant, '[i]n the context of conspiracy, severance will rarely, if ever, be required.'"). Additionally, the racketeering conspiracy alleged here supports a joint trial with all three defendants as "the jury obtains a more complete view of all the acts underlying the charges than would be possible in separate trials" which aids the jury in "arriv[ing] more reliably at its

conclusions regarding the guilt or innocence of a particular defendant." *Buchanan v. Kentucky*, 483 U.S. 402, 418 (1987).

Defendants' argument that severance is required to avoid a lengthy and complex trial is also meritless. Courts routinely hold trials that involve more than the three defendants joined together here and last longer than the initial estimate of three-months and the more recent estimate of four to six weeks for the Government's case-in-chief plus any additional time for the defense case. ECF No. 91 at 32 n.5; *see, e.g., United States v. Reyes-Villatoro, et al.*, Crim. No. 13-615 (D.N.J. 2016) (Chesler, J.) (denying motions to sever in twelve-defendant gang trial scheduled for four months); *see also United States v. Baker*, 10 F.3d 1374 (9th Cir. 1993) (affirming denial of severance in fifteen-defendant trial lasting sixteen months). Additionally, holding three separate trials here would take far more time than one trial, would require the Government to call the same witnesses and enter the same evidence on multiple occasions, and would fail to serve the interests of judicial economy or fairness. Accordingly, Defendants' motions to sever are **DENIED**.

## VII.    SEQUESTRATION OF WITNESSES

### A.    Sequestration of Cruz-Diaz's Investigator

After oral argument on February 11, 2020 Cruz-Diaz filed a letter brief requesting that his investigator be permitted to attend trial, arguing that his investigator is essential and should be exempt from sequestration. ECF No. 122 at 1–4. The Government opposed this request, arguing that Cruz-Diaz failed to show essentiality. ECF No. 125 at 1–4.

Under Federal Rule of Evidence 615, at the request of a party, the court must order the exclusion of a witness, with certain exceptions. *See* Fed. R. Evid. 615.[8] Sequestration of witnesses discourages fabrication, inaccuracy, and tailoring. *Id.* advisory committee note; *Gov't of Virgin*

---

[8] The Court may also order the exclusion of witnesses on its own. *See* Fed. R. Evid. 615.

21

*Islands v. Edinborough*, 625 F.2d 472, 473 (3d Cir. 1980). Thus, Rule 615 "carries a strong presumption in favor of" automatic sequestration. *United States v. Jackson*, 60 F.3d 128, 135 (2d Cir. 1995). Nonetheless, witnesses exempted from mandatory sequestration include: "(a) a party who is a natural person; (b) an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney; (c) a person whose presence a party shows to be essential to presenting the party's claim or defense; or (d) a person authorized by statute to be present." Fed. R. Evid. 615. Cruz-Diaz argues that his investigator should be exempt from sequestration under Rule 615(c) as an essential witness. ECF No. 122 at 2–4.[9]

The party opposing sequestration bears the burden to establish how an exception applies and must convince the court to exercise its discretion to exempt the witness from mandatory sequestration. *Edinborough*, 625 F.2d at 475. For Rule 615(c), the party opposing sequestration bears the burden to show why the policy of automatic sequestration does not apply. *Id.*

Rule 615(c) contemplates essential witnesses such as an agent who handled the case or an expert needed to advise counsel. *See* Fed. R. Evid. 615 judiciary committee note. To satisfy this exception, the movant must show that the "witness has such specialized expertise or intimate knowledge of the facts of the case that a party's attorney could not effectively function without the presence and aid of the witness or that the witness would be unable to present essential testimony without hearing the trial testimony of other witnesses." *Oliver B. Cannon & Son, Inc. v. Fid. & Cas. Co. of N.Y.*, 519 F. Supp. 668, 678 (D. Del. 1981). In *United States v. Jackson*, the Second Circuit articulated factors that a court can consider in making a Rule 615 ruling: (1) how critical the testimony in question is, i.e., whether it will involve controverted and material facts;

---

[9] Cruz-Diaz also cited, but did not argue, the Rule 615(b) officer or employee exception. ECF No. 122 at 2. As the Government noted, this exception is inapplicable to Cruz-Diaz's investigator because Cruz-Diaz is a natural person. *See* ECF No. 125 at 2.

(2) whether the information is usually subject to tailoring; (3) to what extent the testimony of the witness is likely to cover the same issues as that of other witnesses; (4) the order in which the witnesses will testify; (5) any potential for bias that might motivate the witness to tailor his testimony; and (6) if the court is considering exempting the witness from sequestration under Rule 615(c), whether the witness's presence is "essential" rather than simply desirable. 60 F.3d at 135 (citations omitted).

Cruz-Diaz argues that his investigator is essential and that sequestering the investigator would not further the policy of Rule 615 because the investigator is not a fact witness or an eyewitness. ECF No. 122 at 2. Cruz-Diaz asserts that the investigator's presence is necessary at trial to listen to testimony to possibly investigate facts, and that at least one court allowed a defense investigator to be present during trial. Id. at 2–3 (citing *United States v. Ortiz*, 10 F. Supp. 2d 1058 (N.D. Iowa 1998)). Cruz-Diaz also argues that his investigator is essential under the *Jackson* factors. ECF No. 122 at 4.

The Government contends that Cruz-Diaz did not satisfy his burden to show that his investigator is essential, arguing that an investigator's presence at trial to possibly investigate facts is insufficient to justify an exemption from sequestration. ECF No. 125 at 1–3 ("That the proposed investigator's role is merely '*possible*' evinces in itself the lack of essentiality."). The Government also states that *Ortiz* is an outlier. *See* id. at 3 & n.1.

The Court finds that Cruz-Diaz has failed to show that his investigator is so essential as to overcome the policy of automatic sequestration. First, Cruz-Diaz fails to explain who the investigator is or whether the investigator has specialized expertise or intimate knowledge of the case such that defense counsel cannot function without him. *See, e.g.*, *United States v. Spencer*, No. 18-114, 2019 WL 2367096, at *3 (D. Minn. June 5, 2019) ("[Defendant's] motion provides

23

no information whatsoever as to [the investigator's] expertise or knowledge of the facts pertinent to this case."). Instead, Cruz-Diaz states that the investigator will "*possibly* investigate facts" and will "listen to trial testimony and identify portions of the evidence that *may be controverted by further investigation*." ECF No. 122 at 2, 4 (emphasis added). Therefore, as the investigator's role is uncertain, he is not the essential witness contemplated by Rule 615(c). *See* Fed. R. Evid. 615 note. Cruz-Diaz's indication that the investigator will not sit at counsel table further bolsters this conclusion because it shows that the investigator is not essential. *See* ECF No. 122 at 3 n.3.

Second, contrary to Cruz-Diaz's argument, the *Jackson* factors do not support exempting his investigator from sequestration. Although Cruz-Diaz claims that his investigator should be regarded as objective (ECF No. 122 at 4), his status as an investigator retained by Defendants to testify on their behalf poses a significant risk of bias and tailoring without sequestration. Additionally, since Cruz-Diaz concedes that his investigator will listen to trial testimony and then may testify himself as to similar topics, this factor points towards sequestration. Most importantly, the last *Jackson* factor—"whether the witness's presence is 'essential' rather than simply desirable"—strongly supports sequestration because although Cruz-Diaz may have shown that the investigator would be helpful, he failed to demonstrate that the investigator's presence is *essential* to his defense. All of the *Jackson* factors discussed above point to sequestration of Cruz-Diaz's investigator here.

Finally, the Court finds that sequestering the investigator furthers the Rule 615 interest in discouraging fabrication. *See United States v. Farnham*, 791 F.2d 331, 335 (4th Cir. 1986) ("Scrupulous adherence to [mandatory exclusion under Rule 615] is particularly necessary in those cases in which the outcome depends on the relative credibility of the parties' witnesses."); *United States v. Burger*, 773 F. Supp. 1430, 1440 (D. Kan. 1991) ("[T]he court concludes that allowing

[the investigator] to sit through the testimony of other witnesses would be contrary to the purpose of sequestration; in other words, it would allow him to shape his testimony to directly refute or corroborate witnesses' testimony to favor defendant.").[10] If the need arises for Cruz-Diaz to verify a statement made at trial, defense counsel can, at that time, communicate the inquiry to the investigator. *See Deleon*, 2018 WL 1871418, at \*4 ("[M]ost of an investigator's job—*i.e.*, investigating—takes place outside of court."). In conclusion, because Cruz-Diaz failed to show that his investigator is essential, his request for an exemption under Rule 615(c) is **DENIED** and his investigator will be sequestered during trial.

## B. Sequestration of the Government's Case Agent

The Government requests that its case agent, FBI Agent Brunner, be exempted from sequestration under Rule 615(b). ECF No. 91 at 160–61.[11]

Federal Rule of Evidence 615(b) plainly exempts the Government's case agent from sequestration as he is a designated representative of the U.S. Government. The Third Circuit permits government agents to remain in the courtroom even if they will later testify. *United States v. Gonzalez*, 918 F.2d 1129, 1138 (3d Cir. 1990). Furthermore, in the notes to Rule 615, the judiciary committee stated its understanding that the Rule 615(b) agent or employee exception was

---

[10] Separately, to the extent Cruz-Diaz relies on *Ortiz*, the Court notes that *Ortiz* has been cited disapprovingly by other courts and is unpersuasive here. *See, e.g.*, *United States v. Deleon*, No. 15-4268, 2018 WL 1871418, at \*2 n.2 (D.N.M. Apr. 17, 2018) (rejecting *Ortiz*'s "freeform balancing between the utility of having a testifying criminal defendant in the courtroom under rule 615(a) and having a case agent in the courtroom under rule 615(c)," because the court must apply the Federal Rules of Evidence, not second guess Congress' policy choices in adopting them).

[11] The Government made this request in response to Rivera-Robles' motion to sequester the Government's agent under Rule 615. *See* ECF No. 86 at 28–29. As noted earlier, Rivera-Robles is no longer part of this case. Cruz-Diaz does not oppose the Government's request to exempt its agent from sequestration. ECF No. 122 at 2 n.2. Nonetheless, to the extent any Defendant seeks to sequester the Government's agent, the Court addresses the Government's request.

intended to apply to government agents and thus exempts them from sequestration. *See* Fed. R. Evid. 615 note. The Government's case agent will therefore not be sequestered during trial.

Accordingly, the Court orders that all witnesses will be sequestered during trial under Rule 615, except the Government's case agent. The Government's request to exempt its case agent from sequestration under Rule 615(b) is **GRANTED** and to the extent any Defendant seeks sequestration of the Government's agent, that request is **DENIED**.

## VIII. DISCLOSURE OF CO-CONSPIRATOR STATEMENTS

The original pretrial motions for the defense included a request that the Government provide advance notice of any alleged co-conspirator statement it planned to admit so the defense could request an admissibility hearing.[12]

The statement of a co-conspirator is admissible as non-hearsay against a defendant if made during and in furtherance of the conspiracy. Fed. R. Evid. 801(d)(2)(E). To admit a statement, the Government must show by a preponderance of the evidence that: "(1) the conspiracy existed; (2) both the defendant and the declarant were members of the conspiracy; and (3) the statement was made in the course of the conspiracy and in furtherance of the conspiracy." *United States v. Bobb*, 471 F.3d 491, 498 (3d Cir. 2006) (citation omitted). In *United States v. James*, the Fifth Circuit articulated a preference that "whenever reasonably practicable," the government make this showing at a pretrial hearing, before admitting a statement under Rule 801(d)(2)(E). 590 F.2d 575, 582–83 (5th Cir. 1979). "*James* hearings" are not mandatory. *United States v. Montemayor*, 703 F.2d 109, 116–17 (5th Cir. 1983). In the Third Circuit, *James* hearings are accepted but "carefully

---

[12] *See* ECF No. 86 at 26–27 (Rivera-Robles' pretrial motion). As noted earlier, Rivera-Robles is no longer part of this case. However, as Cruz-Diaz referenced and supplemented Rivera-Robles' request for a *James* hearing in his reply to the Government's omnibus opposition, the Court addresses that request in this Opinion. ECF No. 98 at 3.

considered and sparingly used" because "control of the order of proof at trial" is within the trial judge's discretion. *United States v. Cont'l Grp., Inc.*, 603 F.2d 444, 456–57 (3d Cir. 1979).

The position of the defense is that the Government should provide advance notice of co-conspirator statements it seeks to admit into evidence so they can request a *James* hearing to determine whether the statement was made in furtherance of the conspiracy, because a curative jury instruction to ignore an already admitted statement will not suffice. ECF No. 98 at 3; *see also* ECF No. 86 at 26–27. The defense also suggested that witnesses need not attend a hearing because testimony can be introduced through the Government or agents and that any purported danger to witnesses is no different at each stage of trial. *See* ECF No. 96 at 13 (Rivera-Robles' reply).

The Government countered that *James* hearings are not helpful in cases like this involving "a complex conspiracy, multiple defendants, and a 'large amount of interrelated testimony.'" ECF No. 91 at 138 (quoting *Cont'l Grp.*, 603 F.2d at 457). The Government also noted that the cases cited by the defense did not require pretrial hearings. ECF No. 91 at 139–40 (clarifying *United States v. Ammar*, 714 F.2d 238, 246 (3d Cir. 1983) and *United States v. Gibbs*, 739 F.2d 838, 843–44 (3d Cir. 1984)). The Government argued that because this case involves "'interrelated testimony' of a continuing conspiracy," a *James* hearing would become "a time-consuming mini-trial." ECF No. 91 at 139–40 (citing *Cont'l Grp.*, 603 F.2d at 457; *Ammar*, 714 F.2d at 247). Moreover, the Government argued that a hearing would force it to "present most of its case" to establish a conspiracy between Defendants and the "various declarants," and that this preview would unduly prejudice the Government and create security concerns for its witnesses. ECF No. 91 at 141 (citing *United States v. Gambino*, 926 F.2d 1355, 1360–61 (3d Cir. 1991)). The Government stated that it will meet its burden for admissibility at trial. ECF No. 91 at 141–42.

The Court, in its discretion, finds that a *James* hearing is not warranted under the circumstances of this case. It is not reasonably practicable to require the Government to fully establish the existence of a conspiracy and Defendants' participation in the conspiracy before trial. Defendants stand accused of multiple counts of racketeering and conspiracy related charges, which require the Government to prove Defendants' participation in the conspiracy and the enterprise. Therefore, the Government's case will undoubtably include evidence offered to prove the existence of a conspiracy, such as interrelated testimony. *See Cont'l Grp.*, 603 F.2d at 457. The nature and complexity of this case make it difficult for the Government to establish a conspiracy and participation before seeking admission of co-conspirator statements. *See United States v. Solomon*, No. 05-385, 2007 WL 927961, at *2 (W.D. Pa. Mar. 26, 2007). It would be an undue burden on all parties to hold a hearing to effectively determine the existence of the conspiracy before trial. At trial, the Government will be required to establish the existence of a conspiracy in order to admit or to sustain co-conspirator statements under Rule 801(d)(2)(E). *See United States v. Tejada*, No. 12-312, 2013 WL 3786299, at *5 (D.N.J. July 17, 2013) (citation omitted) ("As this case is likely to involve a large amount of interrelated testimony, . . . the Government [may] offer the statements of alleged co-conspirators, so long as it establishes the existence of a conspiracy by the end of trial."). Moreover, if the defense believes the Government failed to meet its burden on a statement, they can move to strike it. At this stage, however, a hearing would be a duplicative mini-trial. *See Solomon*, 2007 WL 927961, at *3 (declining to hold *James* hearing in multiple count drug and murder conspiracy case, citing concerns about an extended mini-trial and government witnesses). Thus, to the extent any Defendant requests a *James* hearing, that request is **DENIED**.

## IX. HEIGHTENED JURY SECURITY

The Government moves to empanel an anonymous jury and requests heightened jury security. ECF No. 102. Specifically, the Government requests that potential jurors' names, addresses, and places of employment not be disclosed to the parties, counsel, or the public, and that the jury be transported to trial from an undisclosed location and sequestered during recesses. Id. at 12–13.

"A federal district court may empanel an anonymous jury in any non-capital case in which 'the interests of justice so require.'" *United States v. Dinkins*, 691 F.3d 358, 372 (4th Cir. 2012) (quoting 28 U.S.C. § 1863(b)(7)). In the Third Circuit, the "decision to empanel an anonymous jury is entitled to particular deference, because the district court is especially familiar with the 'local ambience' surrounding a criminal trial." *United States v. Stewart*, 325 F. Supp. 2d 474, 498 (D. Del. 2004), *aff'd*, 179 F. App'x 814 (3d Cir. 2006). In determining whether to order an anonymous jury, courts consider factors such as: "(1) pretrial publicity from prior related cases that may contribute to juror apprehension; (2) any history of violence by the defendant; (3) the severity of the charges facing the defendant; and (4) any claims that the defendant previously intimidated witnesses." *Id.* Anonymous juries ensure the integrity of the judicial process and the safety of the jury, and are commonly used in organized crime cases involving violence. *United States v. Prado*, 634 F. App'x 323, 325 (2d Cir. 2016); *United States v. Pugh*, 150 F. Supp. 3d 218, 222 (E.D.N.Y. 2015); *United States v. Moore*, 651 F.3d 30, 48 (D.C. Cir. 2011). Overall, the decision to order an anonymous jury is based on the specific facts of the case.

The Government argues that jury anonymity and heightened security are necessary given the charges, which assert that Defendants were members of an organized crime enterprise that they maintained through acts of violence and acts intended to undermine the criminal justice system

29

such as witness intimidation. ECF No. 102 at 17–18; ECF No. 120 at 60:22–61:2 (stating that the Government's argument relies "on the conduct that is part of this enterprise, which involves murder, multiple murder conspiracies, and specifically intimidation and obstructionist acts towards individuals who they believe were cooperating with law enforcement"). The Government argues that jury protection is necessary in a case like this, where alleged participation and leadership in a criminal enterprise is indicative of the defendant's dangerousness, propensity for violence, and ability to interfere with the judicial process. ECF No. 102 at 18–19 (citing *United States v. Gotti*, 459 F.3d 296, 345–46 (2d Cir. 2006); *United States v. Rivera*, No. 13-149, 2015 WL 630242, at *4 (E.D.N.Y. Feb. 13, 2015); *United States v. Barnes*, 604 F.2d 121, 130 (2d Cir. 1979)). The Government also notes that anonymous juries have been ordered in several cases in this District involving organized crime and street gangs.[13] Further, the Government contends that the nature of the charges for murder, conspiracy to commit murder, and particularly conspiracy to murder witnesses, could impair the ability of a juror to judge the case impartially, if the juror is not assured that their identity has been protected. ECF No. 102 at 13–14. The Government argues that the evidence it will present, connecting MS-13 to murder and interference with the administration of justice, demonstrates the necessity of an anonymous jury to maintain the integrity of the trial and ensure the safety of the jury. Id. at 14. Finally, the Government adds that an anonymous jury will not prejudice Defendants or hinder their ability to exercise preemptory challenges. Id. at 25–26.

---

[13] The Government cites eight District of New Jersey cases ordering anonymous juries. ECF No. 102 at 13 n.2 (citing *United States v. Hamlet*, No. 14-220 (RICO case involving murder); *United States v. Bergrin II*, No. 09-369 (RICO case involving murder); *United States v. Scarfo*, No. 11-740 (organized crime); *United States v. Shnewer*, No. 07-459 (Fort Dix terrorism); *United States v. Baskerville*, No. 03-836 (death penalty case involving violent drug gang and murder of witness); *United States v. Curry*, No. 04-280 (violent drug gang); *United States v. Bailey* and *Derry*, No. 14-050 (violent drug gang); *United States v. Bergrin I*, No. 09-369 (murder of witness)).

Defendants oppose both an anonymous jury and heightened jury security, arguing that the Government failed to justify these procedures. Defendants claim that heightened security will cause the jury to believe that Defendants are dangerous and guilty, which infringes their presumption of innocence. Defendants further assert that they have no prior convictions for violent crimes and that this case has not been publicized.

The Court finds that several factors support ordering an anonymous jury and heightened jury security. An anonymous jury is appropriate here given the nature and severity of the charges which involve gang activity and organized crime, murder and conspiracy to murder witnesses, and the allegations in the Superseding Indictment of interference with the administration of justice.[14] The underlying circumstances of this case raise a legitimate concern about potential harm to the people charged with deciding the case, the jury. *See United States v. Blackshear*, 313 F. App'x 338, 343 (2d Cir. 2008); *United States v. Prado*, No. 10-74, 2011 WL 3472509, at \*3 (E.D.N.Y. Aug. 5, 2011); *see also Pugh*, 150 F. Supp. 3d at 224 (emphasis added) ("The question is not whether Defendant *himself* poses a threat to the jury, but rather whether there is good reason to believe that the jury needs protection."). The Court finds that anonymity is necessary to protect the jury and to promote impartial decision-making. *See United States v. Scarfo*, 850 F.2d 1015, 1023 (3d Cir. 1988) (noting juror fear of "retaliation from criminal defendants" and reluctance to disclose their information "even in routine criminal cases"). Further, given the proximity of the alleged gang activity to this area and the several similar cases already tried in this District, there is a likelihood that this case will be publicized.

---

[14] Defendants assert that an anonymous jury is not warranted because they have no prior convictions for violent crimes. However, as the Government noted at oral argument, it is not uncommon in cases like this, where the indictment charges extensive criminal histories contained within the allegations, that defendants do not have prior convictions. ECF No. 120 at 71:16–72:4.

To ensure the jury can judge this case without apprehension, the Court grants the Government's requests to empanel an anonymous jury, to not disclose jurors' information, to arrange for transport of the jury, and to sequester the jury during recesses. Based on the circumstances of this case, the charges, and the penalties, the Court finds in its discretion that these protections are necessary to ensure the fair administration of justice and the safety of all involved. These precautions will not deprive the Defendants of their right to a fair trial because empaneling an anonymous jury does not in any way impede the parties' or the Court's ability to voir dire on relevant factors. *See United States v. Savage*, No. 07-550, 2012 WL 4068341, at * 3 (E.D. Pa. Sept. 14, 2012) (citation omitted) ("An anonymous jury and heightened security do not infringe on a defendant's right to a fair trial because '. . . withholding juror[] [information] does not deprive the defense of the information it needs to conduct an effective *voir dire* and exercise its peremptory challenges.'"). Jurors' names, home, and work addresses will not be disclosed, and each juror will be known by a number. The Court concludes that these procedures are consistent with and ensure the impartiality of the jury and the Defendants' rights. Thus, the Government's motion to empanel an anonymous jury and for heightened jury security is **GRANTED**.

## X.    RESTRAINTS

In its motion *in limine*, the Government stated that the Court should make particularized findings regarding restraining the Defendants' legs at trial. ECF No. 102 at 29–33. At oral argument on February 11, 2020, the Government also noted that the same security concerns warranting an anonymous jury also support using leg restraints, such as the number of Defendants and the charges, which include murder, witness intimidation, conspiracy, and obstruction of justice. ECF No. 120 at 72:17–22. Defendants contend that they are not security risks and that leg restraints are not justified. In support, Defendants assert that they have no prior convictions for

violent crimes and have not disrupted any pretrial proceedings. Defendants also claim the jury will hear or see the restraints.

To determine the necessity of restraints, a court considers whether: (1) there is a compelling need for the additional security; (2) there is a less restrictive alternative to the security measures; and (3) restraining the defendant will impair his ability to confer with counsel. *Szuchon v. Lehman*, 273 F.3d 299, 314 (3d Cir. 2001). In making this determination, a court must consider the circumstances of the case. *Deck v. Missouri*, 544 U.S. 622, 632 (2005). A defendant will be restrained if the court finds that the "perils of shackling are unavoidable." *Id.*

The Court finds there is a compelling need to restrain the Defendants' legs at trial. First, Defendants stand accused of multiple violent offenses including murder and conspiracy to murder witnesses, in addition to drug, organized crime, and gang-related offenses. As the Government notes, Defendants "face mandatory life sentences if convicted at trial of the July 1, 2015 murder of Victim-3." ECF No. 102 at 19. Given the very serious nature of these charges, and for many of the same reasons articulated for ordering an anonymous jury and heightened security, the Court concludes that leg restraints are necessary to ensure the safety of Defendants, witnesses, jurors, and others. Although Defendants have not disrupted any pretrial proceedings, they have not yet had to face any witnesses against them. Moreover, there will be three Defendants, defense counsel, interpreters, courtroom staff, the jury, and potential spectators in the courtroom during trial. To ensure the safety of all individuals, Defendants' legs will be restrained.

Second, the Court finds that restraining Defendants' legs and placing a skirt around the tables is the least restrictive alternative.[15] As in other cases, the leg restraints will be wrapped to make them completely inaudible. Further, Defendants will be seated before the jury arrives and

---

[15] The Court notes that the U.S. Marshals have also recommended this approach to ensure the safety of the Defendants and other individuals in the courtroom.

the jury will be discharged before Defendants leave the courtroom during breaks and at the end of the day to ensure the jury does not see the restraints. Additionally, Defendants' hands will not be restrained and they will be seated next to counsel. Defendants can talk to counsel, take notes, review documents and otherwise freely assist in their own defense. In conclusion, the Court finds that leg restraints are necessary for each Defendant given full consideration of the circumstances of this case and **ORDERS** that Defendants' legs will be restrained at trial.

## XI.    COMPEL NON-TESTIMONIAL EVIDENCE

The Government moves for the Court to order the Defendants to submit to photographs of tattoos that they voluntarily placed on their person. ECF No. 117. The Government argues that these tattoos are relevant to the elements of count one of the Superseding Indictment, that is, that Defendants are members of MS-13. Defendants[16] argue that the motion should be denied because there is no relevance between the tattoos that Defendants have today and an alleged conspiracy that ended approximately five years ago. ECF No. 122.

Defendants' argument is that the passage of time makes this inquiry irrelevant because it is not uncommon for inmates to join gangs and obtain tattoos while in jail. Defendants explain that the only relevant inquiry would be what tattoos the Defendants had when they were arrested. Defendants argue that the Government's request is overbroad because they would be unable to determine which tattoos the Defendants had when they were first incarcerated. The Government argues that the tattoos are relevant to proving the enterprise of MS-13 and that compelling Defendants to provide such evidence does not violate the Fifth or Fourth Amendments.

---

[16] Sanchez-Aguilar also noted at oral argument that there are photographs of his tattoos in discovery that police officers took when they stopped him approximately five years ago, which was before his arrest for the crimes charged. ECF No. 120 at 96:21–97:3.

The Constitution does not protect a defendant from giving non-testimonial evidence such as fingerprints or standing in police lineups. *See United States v. Hendricks*, 395 F.3d 175, 183–84 (3d Cir. 2005). Forced fingerprinting, photographing, displaying tattoos, or requiring a defendant to say certain phrases does not violate the Fifth Amendment. *Schmerber v. California*, 384 U.S. 757, 764 (1966). Further, what a person knowingly exposes to the public is not subject to Fourth Amendment protection. *Katz v. United States*, 389 U.S. 347, 351 (1967). Therefore, there is no required showing of probable cause to support a court compelling such evidence. *See Davis v. Mississippi*, 394 U.S. 721, 727 (1969). Lastly, several circuits, including the Third Circuit, have held that tattoos indicative of gang membership or association are relevant and admissible against defendants when they face charges relating to gang membership and enterprise conspiracies. *See United States v. Hill*, 612 F. App'x 111, 114 (3d Cir. 2015); *United States v. Toliver*, 387 F. App'x 406, 420 (4th Cir. 2010); *United States v. Suggs*, 374 F.3d 508, 517 (7th Cir. 2004); *United States v. Gibbs*, 182 F.3d 408, 422–23 (6th Cir. 1999).

Accordingly, tattoos are non-testimonial evidence not protected by the Fifth Amendment. *See Schmerber*, 384 U.S. at 764. Further, a tattoo is knowingly exposed to the public and thus, not protected by the Fourth Amendment. *See Davis*, 394 U.S. at 727. Therefore, the Government may compel such evidence, even absent a showing of probable cause. *See id.* Any arguments regarding the admissibility and relevance of the photographs are not yet ripe and will be heard at the appropriate time. For the reasons set forth above, the Government's motion to compel non-testimonial evidence of the Defendants' tattoos is **GRANTED**.

## XII.   SPEEDY TRIAL

Escalante-Melgar moves to dismiss the indictment on the grounds that his Sixth Amendment and statutory rights to a speedy trial have been violated. ECF No. 82. The

Government opposed the motion. ECF No. 91. The parties submitted supplemental briefing on the matter. ECF Nos. 118, 123.

Escalante-Melgar argues that his Sixth Amendment right to a speedy trial has been violated because 47 months have passed from his arrest to trial. ECF No. 82 at 11–13. He further asserts that the Government bears the burden to justify any delay, that he has asserted his rights in an appropriate fashion, and that prejudice can be presumed here due to the length of delay. Id. at 13–14. With respect to the Speedy Trial Act, Escalante-Melgar originally claimed that 121 days were unaccounted for, but now only alleges 71 days have run. See ECF No. 82, 118.

The Government argues that Escalante-Melgar consented to many of the delays he now claims are unconstitutional, that any delay is related to the complexity of the case, that Escalante-Melgar's only assertion of his speedy trial rights was by way of one *pro se* letter that predated the Superseding Indictment, and that Escalante-Melgar has not suffered any prejudice due to the delay. ECF No. 91 at 97–106. The Government further argues that only 18 days have run on the speedy trial clock. ECF No. 123. The Government notes that it is rare for the Sixth Amendment right to a speedy trial to be violated where the Speedy Trial Act has not been violated. ECF No. 91 at 98.

To determine whether post-indictment delay violates a defendant's Sixth Amendment right to a speedy trial, courts balance: (1) the length of delay; (2) the reason for delay; (3) the timeliness and vigor of the defendant's assertion of his speedy trial right; and (4) the degree of prejudice the defendant has suffered. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). The delay must be viewed through the lens of the "particular circumstances of the case." *Id.* at 530–31.

Numerous courts have indicated "[i]t would be unusual to find the Sixth Amendment has been violated when the Speedy Trial Act has not." *United States v. Aldaco*, 477 F.3d 1008, 1018 (6th Cir. 2007); *see also United States v. Rice*, 746 F.3d 1074, 1081 (D.C. Cir. 2014); *United States*

*v. Banks*, 761 F.3d 1163, 1181 n.9 (10th Cir. 2014); *United States v. McGhee*, 532 F.3d 733, 739 (8th Cir. 2008); *United States v. Bieganowski*, 313 F.3d 264, 284 (5th Cir. 2002); *United States v. Munoz-Amado*, 182 F.3d 57, 61 (1st Cir. 1999); *United States v. Davenport*, 935 F.2d 1223, 1238 (11th Cir. 1991); *United States v. Nance*, 666 F.2d 353, 360 (9th Cir. 1982). Under the Speedy Trial Act, a defendant has a right to be tried "within seventy days from the filing date (and making public) of the information or indictment." 18 U.S.C. § 3161(c)(1). A superseding indictment that adds a new defendant triggers a new seventy-day period. *Henderson v. United States*, 476 U.S. 321, 326 (1986). The period between the filing of the superseding indictment and the defendant's arraignment is excludable under the Speedy Trial Act. *See United States v. Kelly*, 45 F.3d 45, 48– 49 (2d Cir. 1995); *United States v. McKay*, 30 F.3d 1418, 1419–20 (11th Cir. 1994).

Given that it is uncommon for the Sixth Amendment right to a speedy trial to be violated when the Speedy Trial Act has not been violated, the Court will first calculate the days that have run under the Speedy Trial Act. The Court focuses its analysis on the dates in contention by the parties. The speedy trial clock did not begin to run until after Escalante-Melgar's arraignment on June 11, 2018 (ECF No. 49). *See Kelly*, 45 F.3d at 48–49. On June 20, 2018 the Court entered a scheduling order, agreed to by the parties, which provided for a continuance and tolled the speedy trial clock through September 18, 2018. ECF No. 50. The Court entered an additional continuance order, consented to by the parties, on September 25, 2018 which tolled the speedy trial clock through October 31, 2018. ECF No. 52. The Court then entered a subsequent continuance, also consented to by the parties, on November 5, 2018 which tolled the speedy trial clock through November 30, 2018. ECF No. 57. The relevant orders allowing for continuances agreed to by the parties (ECF Nos. 50, 52, 57) each explicitly excluded the day the order was signed and the day

the order expired (June 20, 2018 and September 18, 2018; September 25, 2018 and October 31, 2018; November 5, 2018 and November 30, 2018) in computing time under the Speedy Trial Act.

Based on the above, there are 8 unaccounted for days between the arraignment on June 11, 2018 and the June 20, 2018 scheduling order.[17] There are 6 unaccounted for days between the June 20, 2018 order (ECF No. 50), which expired on September 18, 2018 and the September 25, 2018 order (ECF No. 52).[18] There are 4 unaccounted for days between the September 25, 2018 order (ECF No. 52), which expired on October 31, 2018 and the November 5, 2018 order (ECF No. 57).[19] Therefore, 18 days have run under the Speedy Trial Act.[20] Accordingly, Escalante-Melgar's statutory speedy trial right has not been violated.[21]

Likewise, Escalante-Melgar's Sixth Amendment right to a speedy trial has not been violated. First, considering the length of delay, the Third Circuit has explained that "[d]efendants cannot . . . abuse the system by [consenting to § 3161](h)(8) continuances and then argue that their convictions should be vacated because the continuances they acquiesced in were granted." *United States v. Lattany*, 982 F.2d 866, 883 (3d Cir. 1992). Here, Escalante-Melgar consented to the majority of continuances that he now contends are undue delays.

Further, any time that was not consented to by Escalante-Melgar is due to the nature and complexity of the case. This also speaks to the second factor, the reason for the delay. This is a complex conspiracy case with a total of six defendants charged in the Superseding Indictment, which justifies a longer delay. *See Barker*, 407 U.S. at 530–31; *see also United States v. Saenz*,

---

[17] Days not tolled are June 12, 13, 14, 15, 16, 17, 18, and 19, which totals 8 days.

[18] Days not tolled are September 19, 20, 21, 22, 23, and 24, which totals 6 days.

[19] Days not tolled are November 1, 2, 3, and 4, which totals 4 days.

[20] 8+6+4 = 18 days not tolled.

[21] Beyond the dates in contention discussed above, the Government has provided a comprehensive accounting of the days tolled under the Speedy Trial Act until present. ECF No. 91 at 100–01. The Court has done its own calculation also through present and independently confirms that there is no Speedy Trial Act violation.

623 F.3d 461, 464 (7th Cir. 2010) (explaining that a longer delay is tolerated for a complex conspiracy case with multiple co-defendants than a simple street crime). Therefore, the first and second factors, length of delay and reason for delay, weigh against a finding that Escalante-Melgar's Sixth Amendment right has been violated.

The third factor is the timeliness and vigor of the defendant's assertion of his speedy trial right. Prior to filing this pretrial motion (ECF No. 82), Escalante-Melgar's only assertion of his speedy trial right was by way of one *pro se* letter on January 29, 2018. ECF No. 45. This letter predates the Superseding Indictment and Escalante-Melgar consented to continuances thereafter. Further, any attempt to assign delay to the Government for the recent adjournment of trial is misplaced as this delay stems from his co-defendants' request to have additional time to prepare pretrial motions. Therefore, the third factor, defendant's assertion of his speedy trial right, also weighs against Escalante-Melgar's Sixth Amendment right being violated.

The last factor is the degree of prejudice suffered by the defendant. Due to the complexity of the case, the delay here is not presumptively prejudicial. *See, e.g.*, *United States v. Musick*, 291 F. App'x 706, 720 (6th Cir. 2008) (explaining that a nine-month delay was not prejudicial where there were two defendants and eleven counts regarding multiple allegations of attempted murder); *United States v. Johnson*, No. 05-4440, 2008 WL 2682877, at *4 (E.D. Pa. July 8, 2008) (holding that delay of one year was not presumptively prejudicial where discovery was voluminous); *United States v. Elmardoudi*, 611 F. Supp. 2d 857, 862 (N.D. Iowa 2007) (finding that lapse of almost a year was not presumptively prejudicial where the charges were complex). Here, the last continuance Escalante-Melgar consented to ended on December 1, 2018 and he filed his pretrial motions on November 22, 2019. *See* ECF Nos. 57, 82. Therefore, the delay not directly attributable to Escalante-Melgar is less than one year. In this case, the Superseding Indictment charged six

defendants with participation in a racketeering conspiracy that spanned over a year, three murder conspiracies, a completed murder, extortion, and drug trafficking that all occurred within a far-reaching criminal enterprise. Further, the expansive discovery in this case includes over 20,000 wiretaps the majority of which involve Spanish speakers. ECF No. 91 at 106–07. The Government has produced hundreds of transcripts that may be introduced at trial and needed to be translated into English. Id. Due to the complexity of this case and the amount of discovery, any alleged delay is not presumptively prejudicial. Further, there has been no showing of actual prejudice. Therefore, the fourth factor, the degree of prejudice the defendant has suffered, also weighs against Escalante-Melgar's Sixth Amendment right to a speedy trial being violated.

Accordingly, Escalante-Melgar's motion to dismiss the indictment based on his constitutional and statutory speedy trial rights being violated is **DENIED**.

Date: February 28, 2020

Claire C. Cecchi, U.S.D.J.